**TRICO PRODUCTS CORPORATION,**
Petitioner,

v.

**NATIONAL LABOR RELATIONS BOARD,** Respondent.

**Nos. 29, 30, Dockets 72–1391, 73–1181.**

United States Court of Appeals, Second Circuit.

Argued Oct. 12, 1973.

Decided Nov. 23, 1973.

Frank G. Raichle, Buffalo, N. Y. (Raichle, Banning, Weiss & Halpern and Ralph L. Halpern, Buffalo, N. Y., of counsel), for petitioner.

Warren Ogden, N. L. R. B. (Peter G. Nash, Gen. Counsel; John S. Irving, Deputy Gen. Counsel; Patrick Hardin, Associate Gen. Counsel; Elliott Moore, Acting Asst. Gen. Counsel; William F. Wachter, and Richard A. Cohen, N. L. R. B., of counsel), for respondent.

Before FRIENDLY, ANDERSON and MANSFIELD, Circuit Judges.

FRIENDLY, Circuit Judge:

What began as a rather minor incident in the research engineering and metallurgy departments of Trico Products Corporation (Trico) has subsequently developed into a vigorously contested dispute before the National Labor Relations Board and has finally led to a Board order imposing substantial back pay liability on the company. The escalation of this teapot-sized tempest into a serious legal struggle is attributable to a combination of inept handling by lower and middle management and the Board's unwarranted modifications of the basically sensible recommendations of the Administrative Law Judge.

## I.

Trico's business is the manufacture and sale of automotive windshield wipers and other automotive products. Starting at the end of 1969, the company began to suffer a progressive decline in business due in part to a reduction in the number of automobiles produced and in part to the phasing out of other automotive products. Trico had responded with significant reductions in hourly-paid personnel. On May 14, 1970, J. W. Frey, its Vice President for Finance, circulated a directive to all foremen and department heads on the subject of salaried personnel. Frey's memorandum referred to the gloomy business outlook and urged careful review of operations and efforts at cost reduction, "particularly through reduced overtime and elimination of non-critical work and/or personnel." He promised that "In the event we are advised of personnel not critically needed in any department, we will attempt to reassign the employees." This led to a limited reduction in salaried employees.

On September 15 a heavy blow fell in the form of a nationwide strike at General Motors, which was one of Trico's most important customers. This led to the immediate layoff of another 139 hourly paid employees, bringing the total number down to about 2080 from approximately 3000 at the beginning of 1969.

Among the salaried employees were twelve technicians in Department 54 (Research Engineering), headed by Allan McIntyre, and eight in Department 88 (Metallurgical), directly headed by Michael Tutko although under the general supervision of McIntyre, who reported to Raymond Deibel, Vice President of Engineering. McIntyre and Tutko had been resisting cuts in their departments, arguing that the men had been highly trained at Trico's expense and would be needed when the existing adversities were overcome.

It was in this setting that the incident occurred which precipitated the unfair labor practice charge. The employees had long been displeased over a requirement that they submit "Project Logs" detailing what they had done each day and how much time they had spent on each assignment. Trico was later to explain, evidently to the employees' satisfaction, that these reports were needed for patent protection, but apparently there had been a failure of communication on this score. On October 16, with what on the most charitable view must be considered a classic example of bad timing, three Department 54 employees, Vastola, Clark and Soponski, decided the

moment had arrived to bring matters to a head.[1] On the following Monday, October 19, Vastola prepared a petition, which we reproduce in the margin.[2] This was signed by all the employees in the two departments, and placed in the inter-office mail on October 20.

When he learned of the petition, McIntyre called Vastola into his office and inquired about it. After Vastola had outlined the contents and purpose of the petition, McIntyre expressed the hope that the petition wasn't "worded too strongly because something like this could be taken two ways. Mr. Deibel could look at this and recognize the fellows have a problem and have a complaint or he could hit the ceiling." When Vastola responded that the petition was indeed strongly worded, McIntyre suggested that it be held off until he could talk with Deibel when the latter returned from vacation rather than "hit him with a petition when he walks in the door." Later in the morning McIntyre summoned Clark, Soponski and McTigue, a metallurgical technician, into his office. The conversation was similar to that with Vastola and ended with McIntyre's suggesting that the three talk to other employees with a view to holding up the petition. Still later in the day McIntyre had all the available Department 54 and 88 employees come into his office. He reiterated his request that they hold off and give him a chance to talk to Deibel, since submission of such a petition at the particular time could have an adverse effect on wage increases and "just

could make someone mad." Despite McIntyre's efforts, the employees held a meeting and decided to go ahead.

The next morning McIntyre, who apparently had learned of the decision, allegedly told Soponski that he "had been too good to the guys" and that if they were "going to step on his toes," he was "going to change his ways." McIntyre called another general meeting that afternoon, which was largely a rehash of what had gone before. After the meeting, Tutko called an employee who had not been present to urge him not to support sending the petition; Tutko stated that the petition might cause repercussions and that it would not be wise to send it at the time because of the raise evaluations scheduled for November. Later in the week Tutko asked employee Sparks how he could "be so stupid" as to sign the petition and added, "Do you realize what is going to happen next week when Mr. Deibel gets back?"

On October 27, his first day back at the plant, Deibel called a meeting of the employees of the two departments. He said he first wished to discuss the petition but had some bad news to announce afterwards. He expressed disapproval of the petition which, in his view, made it look to management as if the engineering departments could not solve their own problems; he added that he particularly disliked use of the word "demand." Deibel then explained the purpose of the logs to the satisfaction of the employees. Turning to the "bad news," he referred to the continuing General Motors strike and the possibility

---

1. Trico suggests that the timing was not accidental since the employees feared that further logs would show they lacked sufficient work. However, the Board did not draw that inference or the still more cynical one that the incident might have been staged at this particular time for the very purpose of causing Trico to overreact.

2. TO: Mr. A.E. McIntyre    October 19, 1970
   Mr. M.J. Tutko
   We, the undersigned, strongly protest the use of "Weekly Project Logs" in departments # 54 and # 88. We feel that the use of "Daily Project Logs" is a discrim-

inatory labor practice in that the use of such "Project Logs" is *not* a requirement of all Technical Departments. Since the use of *any* discriminatory practice is prohibited by Federal Law, we *demand* the immediate end of the use of "Daily Project Logs." If this situation is not immediately remedied, the National Labor Relations Board will be asked to arbitrate.
   cc: F. Bresse—R. A. Deibel—R. A. Batt
   Bresse was Trico's Chairman of Labor Relations; Batt was Administrative Engineer and assistant to Deibel. Deibel was on vacation at the time the petition was sent and did not return until October 27.

of one at Ford. Because of Trico's poor economic condition, there would have to be a layoff or, as he preferred to call it, a furlough, effective on October 30. He read the names of eight employees to be laid off; these, chosen in inverse order of seniority, included the three originators of the petition. Each laid-off employee was given a letter stating that his employment had been terminated "because of a reduction in personnel, based on seniority, caused by business conditions." The letter summarized what the employee's duties had been and stated that it was "a pleasure" to recommend him for suitable employment.

At the unfair labor practice hearing, Deibel asserted that the layoffs were not caused by the petition. He said that before he went on his vacation Frey had appealed to him "to continue an effort to keep our non-productive overhead down." Deibel testified that he had met with his subordinates on several occasions during the summer and fall to discuss the problem of excess manpower in various departments. In mid-October, McIntyre, Tutko, and R. A. Batt, Deibel's assistant, held a meeting in which Batt told the department heads that they would have to give serious consideration to implementing layoffs. Deibel claimed that he had finally decided on a layoff during the last weekend of his Caribbean cruise and had telephoned the decision to Batt on the morning that he returned. During their conversation, Batt asked Deibel whether he had seen the petition. When Deibel said he had not, Batt suggested that he look through his mail. Upon finding the petition, Deibel said he was disappointed, and arranged to meet with Batt, McIntyre and Tutko. At the meeting, he allegedly assured them that the petition did not bother him but that economic conditions required a layoff in the production research area. McIntyre and Batt said they had done some work on this but

would like more time. Deibel told them to prepare a list of employees they would consider cutting, and repeated that he could easily straighten out the employees about the logs. At a second meeting later that morning, Tutko agreed to the layoff of two of his employees and McIntyre agreed to give up four.[3] Deibel subsequently decided to lay off a total of eight.

Deibel's bland account of the sequence of events and his own motivations was somewhat discredited by employee testimony concerning post-layoff statements by Tutko, most of which he conceded to be truthful. McTigue reported that Tutko had told him, "They think they've gotten rid of the troublemakers," and added that he had warned the employees not to send the petition. Tutko told another employee, "See what I told you last week would happen. Now you know."

## II.

On a complaint charging various violations of § 8(a)(1), the Administrative Law Judge found that Trico had coercively interrogated employees and threatened them with reprisals with respect to an activity protected by § 7. He declined to credit Deibel's testimony that his decision to make the layoffs had fully matured while he was basking in the Carribean sun and before he knew of the petition; he thought it strange, as we do, that on the morning of his return Deibel "would not first consult with Frey, or other Company officials, before so hastily laying off these experienced employees." On the other hand, with equal good sense, he found that "even absent such [protected] activity, the employees laid off on October 30, 1970 ultimately would have been laid off at some future date due to economic conditions and Respondent's overall program to reduce non-productive work." In addition to the facts already related, he deemed it

---

3. That the eight employees were "laid off," not discharged, is confirmed by their receipt of supplemental unemployment payments from Trico and Blue Cross-Blue Shield pro-

tection which is not accorded to discharged employees, and by the recall, following settlement of the General Motors strike, of the two technicians with the highest seniority.

"particularly significant that none of the laid off employees were replaced by the hiring of any new employees," [4] since this "clearly demonstrates that Respondent was able to continue the operation of its business with this lesser number of employees." He therefore declined to order reinstatement (although he directed that the names of the laid-off employees be placed on a preferential hiring list) and limited the amount of back pay, which was to be determined in a compliance proceeding, to the amount the laid-off employees "would have earned from the date of discrimination to the date they would have been normally laid off, absent the discrimination, less net earnings during said period." On the other hand, he included in his recommendations a "broad order" directing Trico to cease and desist from "[i]n any other manner interfering with, restraining or coercing its employees in the exercise of rights guaranteed them by Section 7 of the Act."

Both Trico and the UAW, the charging party,[5] excepted to the Administrative Law Judge's decision although the General Counsel did not. The Board adopted most of the findings of the Administrative Law Judge but disapproved his decision in one important respect, namely, his conclusion that the petition merely accelerated a layoff which in any event would have occurred relatively soon. It concluded that Trico had apparently believed that because salaried technical personnel were difficult to replace, they should not be laid off no matter what the company's economic condition.[6] The Board further found that "although the question of taking layoff action was debated and was discussed by Deibel with his department heads on a number of occasions following Frey's directive, all had commonly agreed that all their employees should be retained." Since Trico had presented no evidence of contemporaneous layoffs in other departments, the Board perceived "no relevance in the fact that the eight employees named in the complaint were not replaced." Accordingly, it directed that Trico offer the employees reinstatement to their former jobs or, if these no longer exist, to substantially equivalent positions and that the company make the employees whole for any loss of earnings, apparently until the end of time.

## III.

We shall consider in the first instance the conclusions with respect to coercive interrogation and threats. Trico contends with some persuasiveness that McIntyre and Tutko were endeavoring to help the employees, not interfering with, restraining, or coercing them in the exercise of their undoubted right to protest about working conditions. According to the company, McIntyre and Tutko were merely trying to dissuade the employees from taking action which had little chance of accomplishing anything and might suggest to management that the men were reluctant to report what work they were doing because they had very little to do.

4. Although the company has apparently not hired to fill the vacancies, the Board decision noted that two of the eight employees (one of them a sponsor of the petition) were reinstated in March and April, 1971. We were advised at argument that none of the others had been rehired or replaced.

5. The UAW, which had been seeking to represent Trico employees, got into the proceeding at an early stage. The union first charged that the eight technicians had been laid off because of union organizational activities. Discovering that it would not be able to prevail on that point, the union amended the charge to allege that the company had interfered with, restrained and coerced the employees for engaging in protected activities, namely, signing and circulating the project log petition.

6. The Board asserted that besides the eight employees from departments 54 and 88, Trico "laid off none of its salaried technical personnel after March 1970." However, Frank Breese, the head of the company's labor relations department, testified that a number of salaried personnel, including employees in the technical departments, were laid off during 1970. Company records introduced at the hearing indicated that at least 22 salaried employees were laid off between March and the end of October, 1970.

We sustain Trico's position with respect to the interrogation. Neither the Administrative Law Judge nor the Board made any attempt to analyze this in light of the five standards which we announced in Bourne v. NLRB, 332 F.2d 47, 48 (2 Cir. 1964), and have applied in cases too numerous for citation. The interrogation here failed to meet at least four of the five.[7] Trico had no history of hostility to concerted activities or anti-union discrimination; the interrogation was not directed at obtaining information on which to base action against individual employees; the questioner was not high in the company's hierarchy; and the replies were truthful. Even as to the remaining criterion, whether the employee was "called from work to the boss's office" and there was "an atmosphere of 'unnatural formality'," the second branch was not met.

■ We must reach a different conclusion with respect to the alleged threats. If we were sitting as triers of fact, we might well agree with Trico that in view of all the circumstances, McIntyre and Tutko were endeavoring to dissuade rather than to intimidate. However, the requirement that we sustain findings "with respect to questions of fact if supported by substantial evidence on the record considered as a whole," 29 U.S.C. § 160(e) and (f), applies to inferences as well as to findings of evidentiary facts. Radio Officers' Union v. NLRB, 347 U.S. 17, 48–52, 55–56, 74 S.Ct. 323, 98 L.Ed. 455 (concurring opinion of Mr. Justice Frankfurter) (1954). During otherwise informal and candid exchanges of views, the supervisors' threats of wage reevaluation, especially in light of Deibel's subsequent precipitous action, supplied a sufficient basis for the conclusion that the petitioners were coerced in violation of § 8(a)(1).

■ We likewise sustain the finding that the petition was a cause of the employees being laid off when they were. To be sure, Deibel testified that he was not disturbed by the petition and evidently succeeded in persuading the employees that their protest was ill-founded. Yet the Board was not bound to credit his claim that it was a mere coincidence that he ordered the layoffs within a few hours of his receipt of the petition, and at the same meeting at which he mildly rebuked the employees for sending it. See NLRB v. Dorn's Transportation Co., 405 F.2d 706, 713 (2 Cir. 1969); United Aircraft Corp. v. NLRB, 440 F.2d 85, 91–92 (2 Cir. 1971). The case would indeed stand differently if Deibel had limited the October 27 meeting to answering the petition, had thereafter discussed the layoff problem with Frey or other members of top management who were unaware of the petition or were demonstrably unaffected by it, and had then done exactly what he did here. The exercise of employee rights protected by § 7 cannot forever disable an employer from taking action deemed appropriate in light of economic needs. But if an officer with power to fire has too low a flash point, the company must bear the consequences.

■ We take a different view with respect to the reversal of the findings of the Administrative Law Judge that an early layoff was in the cards in any event. Although "[t]he 'substantial evidence' standard is not modified in any way when the Board and its examiner disagree," nevertheless "evidence supporting a conclusion may be less substantial when an impartial, experienced examiner who has observed the witnesses and lived with the case has drawn conclusions different from the Board's than when he has reached the same conclusion," Universal Camera Corp. v. NLRB, 340 U.S. 474, 496, 71 S.Ct. 456, 95 L.Ed. 456 (1951). We have frequently applied this principle. See NLRB v. James Thompson & Co., 208 F.2d 743, 745–746 (2 Cir. 1953); NLRB v. Park-Edge

---

7. In *Bourne* we held that the five standards only applied to interrogation that was "not itself threatening." 332 F.2d at 48. McIntyre's October 20 inquiries were much more akin to innocent information-gathering than to coercive grilling.

Sheridan Meats, Inc., 341 F.2d 725, 728–729 (2 Cir. 1965); NLRB v. River Togs, Inc., 382 F.2d 198, 203–204 (2 Cir. 1967). In this case the evidence supporting the Board's conclusion that the eight employees would not have been shortly laid off but for the petition is not substantial "on the record considered as a whole," even if the Administrative Law Judge's decision is not taken into account. To anyone having ordinary business sense it would be obvious that a company which had been obliged to cut its production employees by a third and was threatened with the possibility of having to cut by more was not going to maintain its research departments at full strength indefinitely, at least in the absence of evidence that they were engaged in projects vital to the future success of the company. The evidence is wholly consistent with this view. The Board attempted to minimize the force of Frey's directive of May 14, 1970, by saying that Frey offered to transfer unneeded salaried employees "if possible." This ignores the deterioration between May 14 and October 30, including the General Motors strike, which continued until November 12, and the attendant layoff of another 139 production employees, as well as the prospect of further deterioration in the future. To be sure, McIntyre and Tutko were fighting to keep their organizations intact, as department heads normally do, but it is uncontradicted that in mid-October Batt told them "Look, let's be serious about this. We have to really consider laying people off." In the face of this and other testimony we have recited, the Board's finding that "although the question of taking layoff action was debated and was discussed by Deibel with his departmental heads on a number of occasions following Frey's directive, all had commonly agreed that all their employees should be retained," lacks substantial evidentiary support. We likewise fail to comprehend why the fact that the layoffs of October 30 were largely confined to Departments 54 and 88 deprives of relevance "the fact that the eight employees named in the complaint were not replaced." What the Board seems to be saying is that Trico was so intent on punishing the eight men for making a protest which the company easily satisfied them to have been unwarranted that it was willing to forego for years services needed for the effective conduct of its business. This passes understanding. The Administrative Law Judge was far more convincing in finding that the unfair labor practice merely accelerated the layoffs. The situation is the one, familiar in other contexts, "where a part of the harm caused would clearly have resulted from the innocent conduct of the defendant himself, and the extent of the harm has been aggravated by his tortious conduct;" in such instance the damages should be apportioned as between the tortious and the innocent conduct. Restatement of Torts 2d § 433A at 437.

We shall therefore strike the portion of the order mandating reinstatement and restore the direction of the Administrative Law Judge that the names of the laid-off employees be placed on a preferential hiring list. We shall also eliminate the Board's provision for back pay and restore that of the Administrative Law Judge. While compliance proceedings will be necessary to determine the amount of back pay, these are not to be used to circumvent our decision that the petition merely accelerated a layoff that would shortly have occurred.[8] The

---

8. Our fear that they may be has been enhanced by the contention of Board counsel that the change in the back pay provision was not material since, under the Board's language, the employees are to be made whole only "for any loss of earnings they have suffered in consequence of the unlawful layoffs." In its brief, the Board contends that it altered the Administrative Law Judge's findings only because the claim of no available work was not properly a part of the unfair labor practice hearing, but should have been postponed until the compliance proceedings. In its opinion, however, the Board did not simply vacate the Administrative Law Judge's finding on that account, but considered the question of available work on the merits and strongly implied a decision

issue in the compliance proceeding is not whether but when. Trico may offer additional evidence as to what the men in the two departments had been doing in the months preceding the layoffs, what the anticipated future work load was, how much this could and probably would be trimmed or postponed in light of economic circumstances, and how the work has been handled with the decreased force. The General Counsel, in turn, may inquire what was done in other departments and, if there was a difference, why. We mention these lines of inquiry as illustrative and not by way of limitation. The Board shall then determine on the basis of all relevant evidence the earliest date or dates when the employees would have been laid off in the absence of the petition—unless the parties should find it in their best interest to reach some agreement on this score.

 Finally, we see no justification for the "broad order" recommended in paragraph 1(c) of the decision of the Administrative Law Judge. He offered none except a conclusory reference to "the nature and extent of the unfair labor practices herein found." As explained in Fremont Newspapers, Inc. v. NLRB, 436 F.2d 665, 674–675 (8 Cir. 1970), the phrase "in any other manner" here used is quite different from an order restraining an employer found to have committed § 8(a)(1) violations from engaging in "other like or related acts," as sanctioned in NLRB v. Express Publishing Co., 312 U.S. 426, 437, 61 S. Ct. 693, 85 L.Ed. 930 (1941). The instant order would convert any future § 8(a)(1) charge against Trico, however unrelated to the conduct here at issue, into a contempt proceeding. Such orders should be reserved for egregious cases, of which this surely is not one. Accordingly, we shall eliminate para-

graph 1(c) from the Administrative Law Judge's order, as adopted by the Board; paragraphs (a) and (b) afford all the protection needed and warranted.

The petitions to review and to enforce are respectively granted and denied to the extent indicated. Settle order on ten days notice. No costs.

that the layoffs would not ultimately have occurred for economic reasons. In NLRB v. Dazzo Products, Inc., 358 F.2d 136 (2 Cir. 1966), cited by Board counsel, there was no reason to think the employer's contentions with respect to limitations on back pay would not be fairly considered in the compliance proceedings. Here, in view of the Board's decision, there is every reason to think the company's contention might be deemed foreclosed if we do not direct otherwise.