565 F.2d 1240
 96 L.R.R.M. (BNA) 3273, 82 Lab.Cas. P 10,217
 The FLORSHEIM SHOE STORE COMPANY OF PITTSBURGH,
PENNSYLVANIA, and the Florsheim Shoe Store Company
of Monroeville, Pennsylvania, Petitioners,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
 Nos. 1239, 1240, Dockets 77-4046 and 77-4071.
 United States Court of Appeals,
Second Circuit.
 Argued May 25, 1977.
Decided Nov. 17, 1977.
 
 Dorothy H. Moore, Atty., N. L. R. B., Washington, D. C. (John S. Irving, Gen. Counsel, Allison W. Brown, Jr., Deputy Asst. Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, and Elliott Moore, Deputy Associate Gen. Counsel, Washington, D. C., of counsel), for the Board.
 Marvin Dicker and Jonathan L. Sulds, New York City (Proskauer, Rose, Goetz & Mendelsohn, New York City, of counsel), for petitioners.
 
 
 1
 Before FEINBERG and DANAHER,* Circuit Judges, and DOOLING,** District Judge.
 
 DOOLING, District Judge:
 
 2
 Petitioner Florsheim on September 18, 1975, terminated eleven part-time sales employees working in Florsheim's five retail shoe stores in the Pittsburgh area. Florsheim contended that the terminations put into effect a plan, formulated much earlier, to have only full-time employees in its Pittsburgh area stores. The terminations came three weeks after Retail Store Employees Union Local 1407 had requested Florsheim to recognize it as bargaining agent for all full-time and part-time sales and non-selling employees in Allegheny County, and to begin negotiations for an agreement. Local 1407 had on the same day filed a representation petition with the Regional Office of the National Labor Relations Board. Ten days before the termination of the eleven part-time employees Local 1407 had filed with the National Labor Relations Board an unfair labor practice charge against Florsheim alleging that Florsheim had on August 29, 1975, discharged a full-time employee because of his union membership and activities, and because of his activities in concert with other employees for collective bargaining purposes, and in order to discourage membership in Local 1407. On September 19, 1975, a further charge filed in the same case based the charge of unfair labor practice additionally on the terminations of September 18th, and on Florsheim's alleged refusal to bargain with Local 1407. Later amendments of the charge contended that one full-time employee was transferred for the same reasons and purposes. It appears that after the twelve terminations, and the bringing in of seven out-of-town full-time employees, members of Local 1407 did not constitute a majority of the Pittsburgh area employees.
 
 
 3
 After a formal hearing in March 1976, Senior Administrative Law Judge Joseph G. Nachman, on September 22, 1976, decided that Florsheim, by discharging twelve employees and transferring one because all had aided and supported the Union, had discriminated against each of them in hire, tenure and terms of employment, discouraging Union membership, and had, by doing so, engaged in unfair labor practices proscribed by Section 8(a)(3) and (1) of the National Labor Relations Act (29 U.S.C. § 158(a)(3) and (1)); he decided further that Local 1407 had been from August 28th onward the duly designated bargaining representative in an appropriate unit that included Florsheim's part-time selling and non-selling employees in the five Pittsburgh area retail stores and that Florsheim's refusal, on and after August 29th to recognize and bargain with Local 1407 was an unfair labor practice proscribed by Section 8(a)(5) and (1) of the Act (29 U.S.C. § 158(a)(5) and (1)). The recommended Order required Florsheim to cease from activities encouraging or discouraging membership in Local 1407, from refusing, on request, to recognize and bargain with the Local, and from otherwise interfering with its employees' rights of self-organization. The recommended Order affirmatively directed Florsheim to recognize and bargain with the Local on request, and to
 
 
 4
 "Offer immediate, full and unconditional reinstatement to (thirteen men named in the charge as discharged or transferred) to the job said employees, severally, held prior to the discrimination against them, without prejudice to their seniority or other rights and privileges, and make each of them whole for any loss of earnings they may have severally suffered, in the manner set forth in the section hereof entitled 'The Remedy'."
 
 
 5
 The "Remedy" section of the Order referred to required Florsheim to pay each of the employees a sum equal to what he would have earned from the date of his termination or transfer to the date of the offer of reinstatement less any amount earned as wages in that period, with interest. On January 17, 1977, the Board affirmed the rulings, findings and conclusions of the Administrative Law Judge, supplementing his findings with a conclusory finding that certain facts found by Judge Nachman constituted an instance of coercive interrogation violative of Section 8(a)(1) of the Act. The Board adopted the Recommended Order and directed Florsheim to comply with it.
 
 
 6
 Florsheim challenges certain of the specific findings of unfair labor practice, but its principal challenge is directed to the finding that the terminations of the part-time employees violated Section 8(a)(3) and (1) of the Act, and to the order to offer the employees reinstatement to part-time positions notwithstanding the change in Florsheim's operations to eliminate part-time jobs. It is concluded that the Board's order must be affirmed so far as it determines that Florsheim engaged in the unfair labor practices detailed in the decision of the Administrative Law Judge; the findings are supported by substantial evidence, and the issues of credibility were explicitly resolved on readily supportable grounds. Universal Camera Corp. v. NLRB, 1951, 340 U.S. 474, 492-497, 71 S.Ct. 456, 95 L.Ed. 456. The remedy of reinstatement presents a more difficult question. It is concluded that the findings do not support so much of the Board's order as directs Florsheim to offer the former part-time employees unconditional reinstatement to their former positions and to make good their wage losses from the date of discharge to the date of the offer of reinstatement. That part of the order, paragraph 2(b), must be set aside and the case remanded to the Board for further proceedings consistent with this opinion.
 
 
 7
 1. Florsheim contended that, having observed that the expansion of sales in the Pittsburgh area was lagging that of the stores in the rest of the country, it attributed the lag to the number of part-time employees in the Pittsburgh stores, and decided in December 1974 or January 1975 to "go to full time people." The major problem with part-time people, Florsheim's principal witness said, was that part-time salesmen were weaker salesmen than full-time salesmen and yet were used in peak sales hours when the best help was needed. However, that problem, the witness said, had existed to his knowledge for about six years, and the record does not bear out the assertion that a definite corporate decision was reached before the request for union recognition was made.
 
 
 8
 The evidence includes nine payroll register pages proffered to show the existence of an early decision to eliminate part-time help. Each of the pages records the payroll data of one store for one week; the pages are for weeks ended on and between January 9, 1975, and April 3, 1975. They refute rather than support Florsheim's contention. Four of the pages are for the South Hills Village store; they show that on January 9th there were three part-time employees and that the Florsheim National General Manager directed the elimination of one part-time employee. That was done. On January 30th, when there were two part-time employees, he directed the elimination of one, but that was not done. On February 13th he directed the elimination of both part-time employees, and one was eliminated. On March 13th one part-time employee remained on the payroll and the directive was, simply to "reduce." Two pages record the payroll data for the Northway Center store where on January 30th there were three part-time employees. The elimination of one was directed. On February 13th, however, the number of part-time employees had apparently increased to four, and the elimination of two was directed. The Monroeville store on February 13th had two part-time employees and the directive was simple to "reduce" part-time. On February 13th the Smithfield Street store in Pittsburgh had two part-time employees, and the directive was to reduce part-time help. On April 3rd there were three part-time employees at the Fifth Avenue store in Pittsburgh; the directive was to reduce part-time "Hours." The most that can be argued from this evidence is that the stores were considered over-staffed, and that reductions of force should be in part-time personnel and part-time hours.
 
 
 9
 There was, indeed, testimony that the general manager, in consultation with his administrative assistant and the regional supervisor of stores, concluded that they would go to full time help in Pittsburgh, but the record is clear that the reviews of payroll data through March resulted only in instructions to "reduce the part-time help, and, in some instances . . . to eliminate the part-time help." It was suggested that the supposed program was not followed out because of the diversion of the general manager's attention to other work that took him out of his office for protracted periods, followed by his vacation, but there is in reality no clear evidence that an unambiguous corporate decision had been made. There was testimony that the Pittsburgh area manager understood that he was instructed "to work on making those changes . . . reducing part-time people, and having just full-time people," but that he resisted because the change would deny him the kind of operating flexibility that he felt that he required, and he did nothing to implement the proposed change. The general manager testified that he took personal charge of the matter when he returned from vacation on August 18th, but the area manager did not return from his vacation until August 25th. The testimony was that only the supervisor of stores communicated with the area manager in the two weeks following August 18th: the general manager did not do so before August 29th when, admittedly, Florsheim received Local 1407's request for recognition.
 
 
 10
 The testimony of the general manager comes down to the fact that as late as August 22nd his "decision" was still an equivocal disposition to reduce or eliminate part-time employment in Pittsburgh. Only after the general manager on September 8th and 9th met with the area manager in Pittsburgh and met also with each of the five store managers did he, his testimony indicates, make the decision to replace all the part-time employees in the Pittsburgh area stores. That, he testified, was the final step in a decision taken eight months earlier when he "started on the program to eliminate and reduce or phase . . . out" part-time employment. But the events demonstrate that there was no earlier decision. Florsheim's decision took the form of executive acts emanating from the Pittsburgh meetings of September 8th and 9th. On September 16th the Pittsburgh store managers went through the motions of asking the part-time employees whether they would work full-time. One man, a student, was willing to work full-time, but, then, Florsheim abruptly advised him that his available hours were not suited to the store hours of the store to which Florsheim professedly wished to transfer him. The Florsheim store managers terminated all the part-time employees on the evening of September 18th. Seven out-of-town employees were transferred into the Pittsburgh area stores to replace the part-time employees. The part-time employees were terminated without advance notice, and the seven out-of-town employees were transferred to Pittsburgh on short notice and at Florsheim's expense.
 
 
 11
 The effort to unionize the Pittsburgh area stores had been started in late March, 1975, when the Local 1407 organizer met with two full-time employees and one part-time employee who worked in the Monroeville store. All three signed membership applications which included a checkoff assignment and authorization. The Local 1407 organizer gave the three a number of membership applications, booklets entitled "It Pays to Belong," and a pamphlet on employee rights. The two full-time employees directly and through other employees in other of the five stores extended the organizational effort to all five stores, mainly during August 1975. By August 28th, when the last three employees signed applications for union membership, seventeen of the twenty-two employees had applied to join Local 1407. Of these twelve were part-time employees and five full-time employees; one of the latter withdrew his application later, but before September 18th. On that date there were nine full-time employees four of whom were members of Local 1407. Of these four, one was discharged on August 28th-29th for allegedly unrelated reasons, and one was transferred against his objection.
 
 
 12
 The evidence sufficed to warrant the conclusion that the September 8th and 9th intervention of Florsheim's general manager and supervisor of stores and the follow-up September 16th to 18th intervention of the administrative assistant to the general manager could not credibly be considered implementation of a corporate policy delayed in its execution by the resistance of the area manager but was discriminatory conduct that violated Sections 8(a)(1) and (3) of the Act. The conclusion is confirmed in the evidence of the interrogation of the employees about their relation to the union and membership in it, the evidence of the inadequate explanation of the rejection of the one part-time employee who sought full-time employment, and the evidence of the otherwise inexplicably harsh transfer of one of the two full-time employees who had participated in the initial March meeting with the Local 1407 organizer to a store far from his home despite his acute family problem, and by the evidence of the egregious conduct of the managers of the Northway Center and Smithfield Street stores.
 
 
 13
 Substantial evidence supports the findings of the Board. Only in the matter of the discharge of Bakowski, a full-time employee, can it be said that the issue of fact was arguably close, and there the record supports the finding that Bakowski was not discharged until August 30th, the day after the area manager received Local 1407's request for recognition and after Bakowski's store manager had questioned another of the store employees about membership in the union.
 
 
 14
 Florsheim urges that the standard of review applied in NLRB v. M. H. Brown Co., 2d Cir. 1971, 441 F.2d 839 requires a reversal here. But the employer in Brown showed that the two events most important in the Board's decision, a complex pay increase and the layoff of seven men, were rooted in specific objectively demonstrated events in Brown's recent business history and that they eventuated in appropriate business acts which could not support an inference of anti-union animus, and the other two factors were neutral in content; on the record, the Board's findings were critically incorrect; a gratuitous suspicion had been improperly erected into a finding of unfair labor practice.
 
 
 15
 2. Florsheim contends that Local 1407 did not represent a majority because its majority count depended on counting the "lawfully" discharged part-time employees, and because the membership cards it obtained were not valid as designations of Local 1407 as collective bargaining representative of the Pittsburgh employees.
 
 
 16
 Taking the latter contention first: There is, in truth, no room for an inference that the men did not realize that they were choosing a union to get them better wages and fringe benefits. Not all but most of the employees testified that they read the membership card, including the representation authorization, before they signed it; all testified to signing the cards, one by proxy; nothing in the record authorizes an inference that the employees were overreached either by the form of the card or in the circumstance of their signing. None of the employees who signed the cards testified to a wish to withdraw his authorization, or to dissociate himself from Local 1407 except one employee who withdrew his authorization before the terminations of September 18th. Joining a union normally implies an authorization to the union to act as bargaining agent, and in the present case that implication was especially clear. NLRB v. Consolidated Machine Tool Corp., 2d Cir. 1947, 163 F.2d 376, 378; Ace-Alkire Freight Lines, Inc. v. NLRB, 8th Cir. 1970, 431 F.2d 280, 283; cf. NLRB v. Scoler's Inc., 2d Cir. 1972, 466 F.2d 1289, 1292 n. 3. See NLRB v. Gissel Packing Co., 1969, 395 U.S. 575, 606-609, 89 S.Ct. 1918, 23 L.Ed.2d 547. This is not a case in which there were misrepresentations of the purpose for which membership cards were solicited (contrast Snyder Tank Corp. v. NLRB, 2d Cir. 1970, 428 F.2d 1348, 1350, with Schwarzenbach-Huber Co. v. NLRB, 2d Cir. 1969, 408 F.2d 236, 246-247); that some of the employees may not have read the fine print authorization language can not obliterate the fact that they joined the union for the most obvious and traditional of purposes, better terms of employment through union representation.
 
 
 17
 The Board's determination, which is supported by substantial evidence, that the dismissal of the part-time employees was an unfair labor practice requires rejection of Florsheim's contention that Local 1407 did not represent a majority of the employees in the unit made up of all regular full-time and part-time selling and non-selling employees in the five Pittsburgh area stores. If, as in Stone & Webster Engineering Corp. v. NLRB, 1st Cir. 1976, 536 F.2d 461, the terminations could be related to specified economic conditions and a related general contraction of staff, or to some comparably definite and identifiable business change, an inference of permissible business purpose might be possible. But here there was no basic change in business method; full-time employees were brought in to do exactly the work that the part-time employees had been doing. The supposed economic decision was so long aborning that it could produce no definite action. But the fact of unionization presented a solid economic reason for action that could, through crystallizing the plan, covertly frustrate the unionization by openly installing full-time personnel who might, perhaps, be more experienced salesmen. The vaguely outlined business purpose, taken alone, could not explain the precipitate action taken; the purpose of discouraging unionization that the Board found from the evidence persuasively explained Florsheim's action.
 
 
 18
 3. Florsheim's attack on the bargaining order rests on its contention that the dismissals of the part-time employees were lawful and that such dismissed employees may not be counted toward a union majority and on the contention that the membership cards did not authorize the union to act as collective bargaining agent. Both contentions fail on the facts. There was no defect in the bargaining authority of Local 1407, and, because the part-time employees were not lawfully dismissed, they could be counted in determining the status of the union under NLRB v. Gissel Packing Co. supra.
 
 
 19
 Gissel is clear that the remedy of a bargaining order is appropriate where the Board finds that the employer's unfair labor practices have determined a union's majority and so made a fair election unlikely (395 U.S. at 610-615, 89 S.Ct. 1918). Authority to issue a bargaining order exists where there is a showing of employer misconduct and a showing that at one point the union had a majority; in such cases the order serves both to effectuate an ascertained employee free choice and to deter employer misconduct (395 U.S. at 614). There is no doubt here that the dismissals ended the majority that existed on August 29th (cf. Harper & Row Publishers, Inc. v. NLRB, 8th Cir. 1973, 476 F.2d 430, 435-436, cited by petitioner), or that the dismissals constituted the very unfair labor practice that undermined the union's majority (cf. Choc-ola Bottlers, Inc. v. NLRB, 7th Cir. 1973,478 F.2d 461, 464, cited by petitioner). The facts properly found by the Board are exactly those which invoke a Gissel type bargaining order. Donovan v. NLRB, 2d Cir. 1975, 520 F.2d 1316, 1322; Seeler v. Trading Port, Inc., 2d Cir. 1975, 517 F.2d 33, 40; NLRB v. Scolers, Incorporated, 2d Cir. 1972,466 F.2d 1289, 1292-1294; NLRB v. V & H Industries, Inc., 2d Cir. 1970,433 F.2d 9; Byrne Dairy, Inc. v. NLRB, 2d Cir. 1970, 431 F.2d 1363; Ace-Alkire Freight Lines, Inc. v. NLRB, supra, 431 F.2d at 284.
 
 
 20
 4. Florsheim contends that even if the Board was right in finding that the termination of the part-time employees was an unfair labor practice, the order directing Florsheim to offer the dismissed employees unconditional reinstatement to their former part-time jobs went too far. Florsheim argues that it is enough to offer the former employees full-time jobs as such jobs become available. The remedy Florsheim suggests is self-evidently inappropriate and inadequate, but the Board's remedy presents a question of some difficulty. NLRB v. Savoy Laundry, Inc., 2d Cir. 1964, 327 F.2d 370, does not imply a principle that an employer may never be required to reconstitute a discontinued activity if the discontinuance of it was integral to an unfair labor practice. That relief was denied in Savoy because the anti-union shutdown of the activity involved had continued for three years, its patronage had presumably been lost, and to require resumption of the activity would have been unduly harsh. The Court, rather, implied that an order to reinstate a discontinued activity would be authorized if to order it would be reasonable and business-like. Trico Products Corp. v. NLRB, 2d Cir. 1973, 489 F.2d 347, 352-354, set aside an order to reinstate because there was not substantial evidentiary support for the Board's finding that although layoff action had been discussed on a number of occasions, management had been agreed that all employees in the departments involved would be retained. The court, and the Administrative Law Judge, read the evidence as showing that there had been company wide layoffs due to contraction of business, and that the unfair labor practice merely accelerated the challenged layoffs. The Board was directed on remand to determine by factual investigation to what dates back pay should be awarded.
 
 
 21
 As Florsheim argues, reinstatement of all the part-time employees may displace some full-time employees. But that is an inevitable consequence of any order to reinstate employees whose dismissal was unlawful. The Board has the power to order reinstatement (NLRB v. Jones & Laughlin Steel Corp., 1937,301 U.S. 1, 47-48, 57 S.Ct. 615, 81 L.Ed. 893), and it is the normal remedy in the circumstances of the present case. Southern Tours, Inc. v. NLRB, 5th Cir. 1968, 401 F.2d 629, 633. In the present case the economic reasons advanced as justifying the dismissals and as militating against reinstatement as a remedy are at best slight. The work continues at the same work places and to the same purpose; only hours of service are altered, and they have been altered not to avert loss, but to enhance a too modest improvement. Reinstatement as a remedy is not in principle inappropriate simply because the dismissals may also have advanced a general economic interest independent of the interest in discouraging unionization. Cf. Manley Transfer Co. v. NLRB, 8th Cir. 1968, 390 F.2d 777, 781-782. And in any event since Local 1407 attained majority representation status before the decision to terminate part-time work was made, Florsheim was at minimum under a duty to consider with Local 1407 the time and manner of implementing the decision and the consideration to be given to the part-time employees. Cf. NLRB v. Rapid Bindery, Inc., 2d Cir. 1961, 293 F.2d 170, 176.
 
 
 22
 Although reinstatement was in principle the appropriate relief, it is not implicit in the Board's rejection as incredible of Florsheim's testimony that the part-time employees were terminated in delayed execution of an early decision to eliminate part-time help for economic reasons that the Board also found that the economic point was invalid or non-existent. The critical emphasis of the Board's finding is that the dismissals were based upon antipathy to the union activity of the part-time employees; it is consistent with the finding to suppose that there was an amorphous preference for full-time over part-time service based on business considerations, and that there was a general disposition to go over in time to full-time employment. Florsheim was entitled to have the Board shape its order in a form that did not impose a duty to recreate for an indeterminate period jobs that would have been "phased out" of existence over time whether or not there had been a dispute over unionization. The Board's first-stage task as in Savoy Laundry (327 F.2d at 371), was to determine whether the economic reason was honestly invoked and was in fact the cause of the dismissals; on the unfair labor practice issue it was necessary to determine the existence and the general validity of the economic policy. Cf. NLRB v. Geo. J. Roberts & Sons, Inc., 2d Cir. 1971, 451 F.2d 941, 948. On the issues of remedy, however, the existence and the validity of the economic policy and the effect its implementation would have have on the duration of part-time jobs and the number of jobs that would exist over time was important. It may well be that on the present record or on the record as supplemented the Board might find that the economic policy had valid existence, and would have been implemented over a determinable period of time. Certain of the part-time employees were students who may not have planned, or may not have been able, to continue with Florsheim beyond dates determined by their educational plans. Hence the order to offer unconditional reinstatement to part-time work and to make the part-time employees whole for earnings losses to the date of the offer of reinstatement is not supportable in the absence of findings with respect to the reality of Florsheim's stated policy favoring full-time staffing of the Pittsburgh area stores, the duration and, over time, the number of part-time jobs that would have been available, the experience of the Pittsburgh area stores on the duration of part-time jobs, and such other findings as may be required to frame a remedial provision that will, without impairing Florsheim's right to make legitimate business decisions, so far as feasible recreate the situation that would have followed if Florsheim had not dismissed the employees, and had recognized and dealt with Local 1407. Cf. Savoy Laundry, 327 F.2d at 372; International Ladies' Garment Workers v. NLRB, 1972, 150 U.S.App.D.C. 71, 85, 463 F.2d 907, 921; Trico Products Corp. v. NLRB, 2d Cir. 1973, 489 F.2d 347, 352-354.
 
 
 23
 5. Florsheim points out that the Administrative Law Judge, in response to Florsheim's motion to sequester the witnesses, ruled
 
 
 24
 ". . . the Board's rule, as I understand it, or the Board's construction of its rule, is that any person alleged to the complaint, be it an 8(a)3, is entitled to be present in the Hearing Room. He is, in fact, a party to the proceeding. He is entitled to be present."
 
 
 25
 Florsheim complains that the testimony respecting the membership cards could well have been influenced by the circumstance that the discriminatees heard one another's testimony.
 
 
 26
 On the record there does not appear to have been any conforming of testimony. Counsel set a pattern of questioning that elicited expectable answers. Here, the effect of not sequestering was at minimum. The Administrative Law Judge was evidently experienced and it is not possible to assume that he failed to evaluate the testimony in the light of the witnesses' opportunities to profit by having heard their fellow employees testify.
 
 
 27
 Nevertheless, it is less than satisfactory that five months after the very complete discussion in NLRB v. Stark, 2d Cir. 1975, 525 F.2d 422, 426-430, of the matter of sequestering discriminatees who are to be called as witnesses in Board proceedings, there is no indication that the matter of sequestration has been reconsidered. See also L.S. Ayres & Co. v. NLRB, 4th Cir. 1977, 551 F.2d 586, 588. It is trusted that the Board will consider the matter in the very near future, if it has not already done so.
 
 
 28
 The order of the Board is modified to the extent of setting aside paragraph 2(b) and is in other respects enforced, and, so far as concerns paragraph 2(b) of the order, the case is remanded to the Board for further proceedings consistent with this opinion.
 
 
 
 *
 Of the District of Columbia Circuit, sitting by designation
 
 
 **
 Of the Eastern District of New York, sitting by designation