**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

**and**

**Local 107, International Ladies' Garment Workers' Union, AFL–CIO, Intervenor,**

**v.**

**SOLBORO KNITTING MILLS, INC., Respondent.**

**No. 235, Docket 77–4081.**

United States Court of Appeals, Second Circuit.

Argued Dec. 1, 1977.

Decided March 8, 1978.

Eric Gray Moskowitz, Washington, D. C. (National Labor Relations Board, Paul J. Spielberg, Deputy Asst. Gen. Counsel, John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Associate Gen. Counsel, and Elliott Moore, Deputy Associate Gen. Counsel, Washington, D. C., of counsel), for petitioner.

Max Zimny, New York City (Lester Kushner, Sandra M. Nathan, New York City, of counsel), for intervenor.

Martin H. Scher, Mineola, N. Y. (Bruce R. Millman, Mineola, N. Y., of counsel), for respondent.

Before MOORE and GURFEIN, Circuit Judges, BONSAL, District Judge.*

MOORE, Circuit Judge:

Respondent Solboro Knitting Mills, Inc. ("Solboro") is a small company in Oakdale, New York, which engages in manufacturing knitted sweaters. The company's operations are, for the most part, seasonal, and its day-to-day business is supervised by Murray Harkavy, the president of the company, and his wife, Rita, the secretary-treasurer of the outfit, who often performs production work on the floor. During the summer of 1974, against the backdrop of a depressed market (with dwindling sales), several of Solboro's thirteen employees, all of whom work in production, decided to look into the merits of union membership. They were apparently spurred on by long-time union member Grace Rugolo, who was first employed by the company for its 1974 season. Rugolo suggested to her co-workers that their complaints of poor working conditions might be remedied by concerted action. When the workers indicated an interest, Rugolo contacted the International Ladies Garment Workers' Union Local 107.

By October 4, 1974, nine of the thirteen employees had signed cards authorizing the union to represent them for collective bargaining. That morning, two union representatives visited the company office and demanded recognition for Local 107, claiming that it represented a majority of the employees. Mr. Harkavy told the union agents to either make an appointment to see him later, or to send a letter. The union did so the same day, confirming, by telegram, the earlier visit and offering to prove the union's majority status. The Harkavys never replied. Rather, they resisted the unionization by means which resulted in the instant case.

After Local 107 complained to the National Labor Relations Board ("the Board"), charges were filed against Solboro. Administrative Law Judge Irving M. Herman ("the ALJ"), after conducting hearings in February and again in October 1975, issued a thorough and detailed decision on December 30, 1975, finding that Solboro had violated section 8(a)(1) of the National Labor Relations Act ("the Act"), 29 U.S.C. § 158(a)(1), by having coercively interrogated and threatened various employees and having offered promises of benefits to in-

---

* Honorable Dudley B. Bonsal, United States District Judge for the Southern District of New York, sitting by designation.

duce them to repudiate their union commitments. Further, the ALJ found that Solboro had prematurely terminated four of its employees because of their union activities, and had refused to rehire them when the 1975 season was under way, all in violation of section 8(a)(3) of the Act, 29 U.S.C. § 158(a)(3). To remedy the unfair labor practices, the ALJ recommended that Solboro be ordered to offer reinstatement to the four employees so wronged, and to compensate them by means of backpay for earnings they would have received had they worked through the 1974 season and had they been rehired on the date they requested to be re-employed for the 1975 season. The latter computation was determined in recognition of the company policy to re-employ satisfactory workers who, at the beginning of a new season, actively indicate a readiness to be rehired. Additionally, the ALJ recommended that Solboro be ordered to bargain collectively with the union upon request, in accordance with *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969).

The Board adopted the findings and conclusions of the ALJ with two modifications: first, with respect to the propriety of the bargaining order, the Board agreed that the conduct violative of sections 8(a)(1) and 8(a)(3) of the Act supported such a remedy; however, as additional justification, the Board unanimously held that, although there had been no allegation in the complaint of a violation of section 8(a)(5), which prohibits refusals to bargain with a majority union, the conduct of the Harkavys found to have violated other provisions of the Act constituted a violation of the uncharged provision as well. The second modification related to the backpay remedy: although two Board members agreed with the ALJ that no backpay was due for the period before the discriminatees themselves initiated a request for re-employment for the new season, a majority of the Board found that the violation actually occurred when Solboro first opened its 1975 season, during the week of May 17, 1975. At that time, according to the majority, Solboro, which had wrongfully discharged the dis-

criminatees, was under a duty to offer reinstatement. Thus, backpay was to be awarded from May 17, 1975 until valid offers of reinstatement were made.

The Board now seeks to enforce the order as modified. Insofar as the Board's order affirmed the ALJ's findings that Solboro violated the Act, we agree that substantial evidence supports those findings; issues of credibility, on which the employer's motivations had to be determined, were explicitly resolved on the record, and supportable inferences were drawn. We thus briefly summarize the violations before turning to what we consider to be the more difficult issue, *i. e.,* the calculation of the backpay award.

## THE SECTION 8(a)(1) VIOLATIONS

The Harkavys' campaign against the unionization started immediately after the union representatives visited the Solboro plant on October 4, 1974. Within minutes after the agents were sent away, Mrs. Harkavy called employee Anna Nemec into her office to ask what she knew about the unionization efforts. Nemec, who apparently had been on friendly terms with Mrs. Harkavy, as were many of the workers in the informal setting of Solboro, admitted to Mrs. Harkavy that she had not said anything about the matter earlier because she supported the union. According to Nemec's credited testimony, Mrs. Harkavy concluded the questioning session by advising Nemec not to "mention this to anyone".

Shortly thereafter, Mrs. Harkavy reportedly approached a group of employees and inquired whether "you girls want the Union?" When no one responded, Mrs. Harkavy stated: "I see you girls don't want your jobs".

These two incidents of questioning were found to constitute coercive interrogation. It followed closely on the heels of the visit to the plant by the union agents; it was not accompanied by an explanation of its purpose nor by any assurance against retaliation. We think that the ALJ properly found that the questioning thus consti-

tuted an unfair labor practice within the requirements of *Struksnes Construction Co.,* 165 N.L.R.B. 1062 (1967) and *Bourne v. NLRB,* 332 F.2d 47, 48 (2d Cir. 1964).

■ Similarly coercive was the next action taken by management to quash the unionization sentiment. That same day—the day of the union demand for recognition—Mr. Harkavy assembled all of the workers to inform them of the union agents' visit and to discuss the financial condition of the company. Mr. Harkavy had recently received a telegram cancelling a complicated order for which materials had already been purchased. To make matters worse, the company's accountant had just informed the Harkavys that Solboro had lost some $15,000 during the preceding year. Obviously, the threat of union demands compounded Mr. Harkavy's fears, and precipitated the speech that he was then to make. He told the workers that he did not see how the company could survive if economic conditions persisted or if there were additional economic expenses. Although there was conflicting evidence as to whether the remarks were limited to predictions of financial condition or whether the remarks were directed to threatening plant closure in the event of a union victory, we think that the ALJ was on firm ground when he found that Mr. Harkavy's speech was violative of the Act in that the workers could reasonably have inferred that the threats were directed toward their decision to join the union. *See NLRB v. Kaiser Agricultural Chemicals,* 473 F.2d 374, 381 (5th Cir. 1973). As the ALJ noted, "[a]n employer who goes so close to the brink takes the risk that employees may honestly misunderstand him". *NLRB v. Rollins Telecasting, Inc.,* 494 F.2d 80, 82 (2d Cir.), *cert. denied,* 419 U.S. 964, 95 S.Ct. 224, 42 L.Ed.2d 178 (1974). Mr. Harkavy could have chosen his words more carefully, and explicitly avoided the likelihood of being misunderstood by adding, as the ALJ suggested, that Solboro would "not close simply because of a [union] victory but only if the Union's demands made continuation impracticable". (Appendix at 37–38). Under the circumstances, we decline the invitation

to substitute respondent's view of the evidence for that of the ALJ.

*O'Connell's Conduct*

The ALJ also found that the conduct of employee Josephine O'Connell in attempting to dissuade the workers from joining the union was to be attributed to the Harkavys. O'Connell was being trained to be a "forelady" at the plant. Accordingly, she relayed messages from Mrs. Harkavy to the other workers, and was considered to speak with some degree of authority. On Saturday, October 5, 1974, the day after the union presented its demand, O'Connell drafted and signed a letter to the union representative, stating: "We the undersigned have discussed your offer and have decided to withdraw our signatures. We do not wish to be represented by the International Ladies Garment Workers Union".

■ O'Connell then obtained the signatures of three of her fellow employees, explaining to the co-signers that she was going to give Mrs. Harkavy a copy of the letter. The ALJ credited testimony to the effect that the reason that O'Connell undertook the task of writing a letter of repudiation was that "the boss had been very good to [her]". He found, too, that Mrs. Harkavy had had prior knowledge of the letter—that she was "expecting it" when it was delivered to her on Monday, October 7. On that day, employee Cacoperdo, who had been one of the co-signers of the repudiation letter, had driven to work with O'Connell. During the ride, they discussed the union campaign and the import of the letter of repudiation. O'Connell was found to have "promised" Cacoperdo that "we'll be taken care of, that we'll always have a job and we'll get a raise". Later that day at work, O'Connell spoke to Cacoperdo and told her that Mrs. Harkavy would take no more orders "until everything is straightened out with the union". O'Connell added that, in her view, Mrs. Harkavy would "rather close the shop than have the Union in". Although there were conflicting reports as to whether the two statements

offered by O'Connell had indeed come from Mrs. Harkavy, the ALJ found sufficient evidence on which to base a holding that Cacoperdo had "gained the impression that O'Connell's statement that the plant would close reflected Respondent's position". (Appendix at 41.) Although O'Connell was not a "supervisor" within the meaning of the Act, Solboro was held liable for her conduct "on an agency theory", (Appendix at 39), pursuant to *NLRB v. Dayton Motels, Inc.,* 474 F.2d 328, 331 (6th Cir. 1973), in which it was held that the acts of non-supervisory employees can be imputed to the employer if the employees in question have close ties with management, as where they "customarily [deliver] to other employees work instructions from management", and particularly where the employer acquiesces in the antiunion efforts of the employee-agent.

Although the question is one susceptible of argument, we think that substantial evidence supports the ALJ's finding in this case. The Solboro employees were aware that a special relationship existed between O'Connell and Mrs. Harkavy. The employees' belief that O'Connell spoke—at least on the topic of unionization—with the authority of management "could only have been fortified by O'Connell's telling her cosigners that she would deliver to Mrs. Harkavy a copy of her letter to [the union agent], as well as by Mrs. Harkavy's statement to [employee] Nemec that she had done 'the right thing' in signing that letter". (Appendix at 39.) On the whole, the inference that O'Connell solicited the employees to repudiate their union commitments with the blessing and support of management was properly drawn. We uphold the Board's finding on this point, even though we think that the bargaining order can be sustained even without attribution of O'Connell's conduct to the Harkavys. The coercive anti-union conduct discussed above was sufficient to support the order under the circumstances of this case, especially since the order was predicated not only on the section 8(a)(1) violations, but also upon the section 8(a)(3) violations, which we now discuss.

## THE SECTION 8(a)(3) VIOLATIONS

Employee Margaret Passannante began working for the company in September 1974, and was given a wage increase the day after she was hired. On October 3, 1974, the day before the union demand, Passannante asked permission to be absent on the next day. Mrs. Harkavy agreed, telling Passannante, "see you Monday". On October 4, shortly after Mr. Harkavy's "speech" to the workers, Mrs. Harkavy phoned Passannante and told her that there would be no more work for her; when she came to pick up her paycheck a few days later and asked when more work would be available, Mr. Harkavy responded with the statement that he would "see when we straighten this out". (This statement was found also to have constituted a violation of section 8(a)(1) insofar as it was intended to restrain Passannante and others from exercising their union rights). The Harkavys told Passannante to "keep in touch" about further work. There was testimony that, after the layoff, Mrs. Harkavy herself operated the machine that Passannante had operated in order to finish the work under production.

Employee Mary White was hired on August 27, 1974. On October 7, after she had completed work on the labeling machine, Mrs. Harkavy told her that there was nothing more to do. The same fate befell employees Grace Rugolo and Donna Moravec. Rugolo was hired in July 1974 and received a wage increase about a week after she began work. Moravec began in May and was given a raise in July. On October 8, Rugolo and Moravec, along with White and Passannante, both of whom had been laid off already, and another employee who was still at work, attempted to distribute union leaflets at the company's drive-way; they were accompanied by two union agents. All were wearing union buttons. Mr. Harkavy drove up and told the union agents to leave. Mrs. Harkavy, after asking Rugolo whether it was legal to wear the union

buttons[1] and receiving an affirmative answer, told Rugolo that she did not want union buttons worn in her "house". Before the end of work that day—which was only four days after the the union first appeared on the scene—Mrs. Harkavy dismissed Moravec and Rugolo, with the stated reason that work had run out.

■■■ The ALJ rejected Solboro's arguments that the layoffs were motivated by nothing more than normal end-of-season procedure, and that sound economic reasons rather than anti-union animus dictated the layoffs at the time and in the manner they occurred. Although it is true that a large order had been cancelled, there was ample testimony that, in point of fact, there was no real slow-down until the end of October. We are mindful of the fact that an employer's motivation involves, essentially, a question "of inferences of probability drawn from the totality of other facts". *NLRB v. Park Edge Sheridan Meats, Inc.,* 341 F.2d 725, 728 (2d Cir. 1965). We think that the timing and the nature of the layoffs, occurring, as they did, within days of the union demand, provided strong evidence supportive of the inferences drawn by the ALJ. Although the layoffs were bound to occur at the end of the season, which, in this case, was found to have been at the end of October (although some work continued into November), there is ample reason to believe that the layoffs of the four union supporters were expedited on the basis of discriminatory considerations, in violation of section 8(a)(3) of the Act.

Furthermore, the record supports the finding that the Harkavys perpetuated the discrimination by refusing to rehire the four discriminatees when the next season began. It should be noted that the initial charges in this action were filed with the NLRB in October of 1974, and that hearings on the discriminatory layoffs were held in February 1975—before the 1975 season began. However, new charges were filed in September 1975, when the Harkavys'

conduct toward the discriminatees after the 1975 season opened suggested that the same anti-union motivations prompted Solboro's refusals to re-employ the four workers then allegedly wrongly discharged. The charges were consolidated, and the hearings were reopened in October 1975, while the initial complaint was pending decision. Thus, the ALJ's findings were forcefully supported by his observations that certain explanations for the denial of rehire, such as general incompetence or other problems in work, were first voiced only after the litigation had begun. Indeed, the only reason given for the dismissals of the employees at the end of the 1974 season was that there was a lack of work.

The 1975 season began in May. At that time, the company recalled some of the more senior employees, including Nemec and O'Connell (on May 12) and Cacoperdo (on June 13). In June, July, and August, the company placed advertisements in the newspaper, requesting various production employees and machine operators and offering training. In the months of June through August, the company hired thirteen new employees, and one more in October.

According to the ALJ's findings, there was no evidence to contradict the testimony of Mrs. Harkavy to the effect that Solboro's "usual practice, on resuming production after a layoff, is not to recall the laid-off employees in the absence of notification of their availability and interest in returning . . . .." (Appendix at 46). Each employee, when laid off at the end of the season, is told to "keep in touch" about re-employment possibilities. According to Solboro's usual practice, satisfactory employees were rehired upon request, assuming the availability of work each new season. (See Appendix at 1026, testimony of Mrs. Harkavy). The ALJ found that each of the four discriminatees, when discharged in 1974, was given the usual send-off. When each of the four sent word, in 1975, however, that she

---

1. Although charged as a section 8(a)(1) violation, this questioning was not found to be violative of the Act.

was interested in employment, no offer was made.

Solboro did, in fact, offer employment to Moravec in June 1975. This offer, apparently, was made in response to an inquiry made on Moravec's behalf in March of that year.[2] However Moravec declined the offer because at that time she was enrolled as a full-time student. Later, on July 14, Moravec did request reinstatement in a letter to Solboro. She did not receive an answer. The reasons given by Mrs. Harkavy at the October 1975 hearings for refusing to respond to the request were not believed by the ALJ. Rather, he believed that the Harkavys, when they made the offer to Moravec in June in response to her case worker's inquiry, had no reason to believe that Moravec's "fidelity to the Union was still intact". (Appendix at 47). But by July, after Mrs. Harkavy had received requests, by registered letter, from the other discriminatees Mrs. Harkavy became convinced, as she testified, that the letters had been set up" by the union, and that her prior offer to Moravec had been an error. *Id.* Thus, although the Harkavys had employed workers who filled the job that Moravec had performed the previous year (after Moravec had initially declined the offer), that hiring had occurred five days *after* the Harkavys received Moravec's July letter. The ALJ determined that the reason for not wanting Moravec to return to work was not, as Solboro claimed, that the job had been filled but was rather Moravec's "connection with the Union" (Appendix at 48); the discriminatory act thus occurred upon receipt of Moravec's letter, on July 16, 1975.

As noted, Moravec was not the first of the discriminatees to have been rejected for re-employment after making a written request. On June 23, 1975, Rugolo had written to Mrs. Harkavy stating: "I . . . am ready & able to report back to work. I trust that I will be hearing from you in the near future". On July 1, Mrs. Harkavy sent the following reply: "I received your registered letter Saturday, but I think you

know what my answer is going to be". Mrs. Harkavy then alluded to a "vulgar, abusive outburst" that had allegedly occurred the last season, and stated that it was impossible, under such circumstances, to continue the employer-employee relationship. The letter was written, as indicated, *pendente lite.* The ALJ specifically credited Rugolo's testimony that there had been no such incident, and he found that the Harkavys' explanation for denying employment to Rugolo was mere pretext.

White wrote to Mrs. Harkavy on July 15 stating that she had noticed an ad for sewing operators, and that she was willing and able to return to work. White received no reply. Passannante also wrote to Mrs. Harkavy on July 21, stating: "Your ad for workers has been in the papers for at least 4 wks. I wasn't called and I'm ready and willing to work right now. Please inform". Mrs. Harkavy did not reply.

In both cases, the ALJ refused to conclude that there were only innocent reasons for denying rehire to these employees, who were praised when they performed the previous season. We are convinced that substantial evidence underlies the Board's findings on this point, and commend the ALJ for the thorough and explicit statement of evidence and findings of credibility and of fact. The inferences that were drawn are clearly supportable. We do not sit to hear reargument on the evidence.

## THE SECTION 8(a)(5) VIOLATION AND THE REMEDY

*The Bargaining Order*

As noted above, the ALJ recommended that a bargaining order should issue, as well as a direction for an offer of reinstatement with backpay. The Board adopted the ALJ's recommendations, and agreed that a bargaining order was appropriate under *NLRB v. Gissel Packing Co.,* 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), which held that an employer may be ordered to bargain with a union, even in the absence

---

2. See Appendix at 1035. Apparently, Moravec was handicapped, and was represented by a case worker in regard to her initial employment and her re-employment efforts.

of an election, when the union has established majority status by other means as, in this case, the possession of cards signed by a majority of the employees authorizing the union to represent them for collective bargaining purposes, in cases where other unfair labor practices have been committed which "tend to preclude the holding of a fair election". *Id.* at 595, 89 S.Ct. at 1930.

In the case at bar, the ALJ found that the unfair labor practices violative of sections 8(a)(1) and 8(a)(3) of the Act were of such a serious and extensive nature that the bargaining order was appropriate. As required by *Gissel* and by *NLRB v. General Stencils, Inc.,* 438 F.2d 894 (2d Cir. 1971), reasons were given for recommending the order in this case: the ALJ found that, even absent the section 8(a)(3) violations, the section 8(a)(1) conduct—particularly Mr. Harkavy's "speech" to the employees threatening them with plant closure—was sufficient in this case to support a bargaining order since the unit is small, and unfair practices "need affect very few employees in order to foreclose a fair and free election". (Appendix at 49).

The Board added another reason to justify the bargaining order: although no violation of section 8(a)(5) of the Act had been alleged, the complaint *had* alleged respondent's failure to recognize and bargain with the union as a violation of section 8(a)(1). In a decision by the Board, *Trading Port, Inc.,* 218 N.L.R.B. 298 (1975), issued between the time the complaint against Solboro was filed and the Board rendered its decision, the Board found that, where an employer refuses to recognize a union that enjoys majority status and subsequently commits substantial unfair labor practices, the employer is guilty of violating section 8(a)(5) of the Act, which prohibits an employer from "refus[ing] to bargain collectively with the representatives of his employees, subject to the provisions of section 9(a)". 29 U.S.C. § 158(a)(5). In *Trading Port,* the Board thus found that a bargaining order could be predicated not only on section 8(a)(1) violations, *see Steel-Fab, Inc.,* 212 N.L.R.B. 363 (1974), but on the denial of recognition of the union as well.

Thus, the Board found ·that, in Solboro's case, the bargaining order was also appropriately entered because, despite the clear union majority as evidenced by the nine union authorization cards—a matter that had been fully litigated in the course of the hearings on the section 8(a)(1) claims—Solboro refused the union's request for recognition.

Solboro argues that the Board erred in considering the section 8(a)(5) violation since none had been charged. It contends that the matter was not, in fact, fully litigated. We disagree. Respondent was charged with refusing to recognize the union on October 4, 1974 and thereafter—in violation of section 8(a)(1). The complaint gave full notice of the claim of misconduct, and it is no denial of due process to predicate an order on a violation, the underlying facts of which have been litigated in full

> "so long as the complaint informs the respondent of the acts which constitute the charged unlawful behavior and respondent is given an opportunity to respond." *NLRB v. Scenic Sportswear,* 475 F.2d 1226, 1227 (6th Cir. 1973).

That the matter of a proper demand for bargaining was fully litigated is made clear by the ALJ's addition of a footnote to his findings, see Appendix at 49 n.76, in which he stated that respondent had contested the sufficiency of the demand for bargaining but that, since no section 8(a)(5) violation had been alleged, had not argued the matter in its brief. However, the ALJ commented that he would have found the bargaining demand sufficient had the matter been pressed.

■ We need not be overly concerned with this point, however, because, even in the absence of a finding that section 8(a)(5) was violated by Solboro, we agree, for the reasons given by the ALJ, that the bargaining order was appropriate under *Gissel.*

*Reinstatement and Backpay*

■ We also agree with the order requiring an offer of reinstatement to the four discriminatees. There is substantial evi-

dence to support the conclusion that, but for their union sympathies, Moravec, Rugolo, White, and Passannante would have been rehired for the 1975 season after management was made aware that they were available for work. Clearly, each is entitled to backpay from the time of her unlawful discharge in early October 1974 through the end of the 1974 season, found by the ALJ to have been October 31, when all workers would have been terminated in any event.

The problem, however, is with the second period of time, the 1975 season. As is evidenced by the divergence of views among the Board members themselves and the ALJ, the question of the proper calculation is not free from doubt: The ALJ and the Board dissenters thought that no backpay was owing until the date when the individual discriminatee actually requested re-employment for the season, because, with few exceptions, *no* employee was given automatic re-employment without initiating the relationship. The majority, however, was of the opinion that the date of the discrimination should be placed at the opening of the new season for, given respondent's previous acts of discriminatory layoff, the respondent was under a legal duty to initiate an offer of reinstatement at the earliest possible moment; the date when operations were resumed for the new season would thus mark the date on which backpay would commence running. The majority relied on *Carbide Tools, Inc.,* 205 N.L.R.B. 318 (1973), in which the Board affirmed the finding of an ALJ that, despite the employer's contention that it had never had a policy of recalling laid-off workers, the wrongdoing employer had the affirmative duty to recall and reinstate workers who had been discriminatorily discharged. In the case at bar, the Board noted, despite Solboro's policy of not initiating the recall of previous employees, there was testimony that, on rare occasion, the employer departed from that practice. Furthermore, the discriminatees would have no basis to believe that their requests would be honored in view of the past discrimination.

In view of the dissenters, *Carbide Tools* was improperly relied upon. There the

Board ordered reinstatement of employees with backpay as of the date of their discharge because those employees would have had continuous work had they not been laid off for discriminatory purposes. Rather, the dissenters, disclaiming that they would create a "seasonal industries exception" to the general reinstatement and backpay rules long followed by the Board, stated that company policy, in this case as in others, should control, because the policy was determinative of the entitlement to employment. For support, they cite *Temperature Systems Corp.,* 195 N.L.R.B. 1023 (1972), wherein the Board found that an employee hired only for the duration of one particular job was discriminatorily discharged prior to completion of the job. The Board did not, however, order reinstatement "since [the discriminatee's] employment would have been terminated upon completion of the . . . job. We accordingly limit backpay to the date Respondent completed [the particular job]."

Solboro argues that *Temperature Systems* is to the point: As in that case, where a discharged employee would have been terminated at some time in any event, the Solboro employees were hired only for the duration of a period of time during which work is available. At the end of that time, they are, despite any terminology to the contrary, terminated. They have no absolute right of recall, and, furthermore, no expectation of recall unless they initiate the relationship. Thus, argues Solboro, the Board erred in awarding backpay as of the beginning of the 1975 season for at that time, the discriminatees had not sought work. Indeed, the ALJ found, on the basis of uncontradicted testimony, that (1) the company policy was to offer employment only when a former satisfactory employee applied, and (2) all of the discriminatees were told, in accordance with that policy, to "keep in touch" in regard to further work. (See Appendix at 27, 46). He further found, on the basis of the company's policy, that no violation of the Act had occurred until Solboro refused to hire the discriminatees in 1975 after they applied for work.

The violation that had occurred the previous fall was not one that continued past the normal termination date. Thus, the remedy should reflect the unique nature of seasonal employment by giving effect to the employer's longstanding and legal hiring practices. To hold otherwise would be to place the discriminatees in a position of superiority vis-à-vis the other employees; it would not restore the *status quo ante,* which is the extent of the Board's remedial authority. *See NLRB v. Remington Rand, Inc.,* 94 F.2d 862, 872 (2d Cir.), *cert. denied,* 304 U.S. 576, 58 S.Ct. 1046, 82 L.Ed. 1540 (1938). To enforce the Board's order would be to presume that the employer, who had admitted no wrongdoing and who normally relied on a sound business practice of awaiting applications before seeking out employees at the start of each season, should have presumed itself guilty of a wrong and pursued a wholly new practice, seeking out persons for more favorable treatment than that accorded to all former employees.

■ We are mindful that the authority of the Board to create appropriate remedies entails great latitude, subject only to limited review in cases where the remedy ordered by the Board does not serve to effectuate the policies of the Act. *See Phelps-Dodge Corp. v. NLRB,* 313 U.S. 177, 194, 61 S.Ct. 845, 85 L.Ed. 1271 (1941); *Fibreboard Paper Products Corp. v. NLRB,* 379 U.S. 203, 216, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964). Nevertheless, we believe that the Board's order in this case must be modified, for it has never been the policy of the Act to force an employer to abandon *legal* hiring practices.

In a recent analogous case before this court, *Florsheim Shoe Store Company of Pittsburgh v. NLRB,* 565 F.2d 1240 (2d Cir. 1977), we set aside the remedial portion of an order of the Board which had required reinstatement of part-time employees because there was insufficient evidence on which the Board could have concluded that the part-time employees would not have been phased out in any event, as was argued by the employer. Reinstatement could not be ordered, we said, if the

wronged employees would have otherwise been lawfully discharged, pursuant to a sound business decision of the company involved. *Id.* at 1247. (Nor would backpay be appropriate, therefore, for the period after which the discriminatees would have been discharged.)

■ The gist of *Florsheim* is that, in framing a remedial order, the Board must take into consideration valid and honestly invoked business policies of the employer, and must make and act on findings "as may be required to frame a remedial provision that will, without impairing [the company's] right to make legitimate business decisions, so far as feasible recreate the situation that would have followed" if there had been no discriminatory conduct. *Id.*

We think that the ALJ made those findings in this case. A valid hiring policy was found to exist. Had there been no discriminatory layoff in 1974, all the employees would have had to have made known their interest in employment before an offer of employment would be made. The policy was applicable to all employees, and there was no evidence that the policy itself constituted an unfair practice.

We do not profess to create a "seasonal industries exception" to the general rule that a wrongdoing employer must shoulder the burden of initiating reinstatement. Rather, we give effect to the policy of this company, which may not be the policy of other seasonal employers and which is not in itself illegally motivated. We therefore hold that the four discriminatees in this case were not illegally out of work until they sought it for the 1975 season. Thus, they should have been reinstated at that time, and they are owed backpay as of that time.

Aside from the backpay owing to the discriminatees for the period between their illegal discharge in 1974 and the end of the 1974 season—found to be October 31—backpay should be computed as follows: White, Passannante, and Rugolo—all of whom wrote to Solboro in June and July—are to be awarded such backpay as may be appro-

priate[3] as of the date their letters were received by Solboro. Moravec, however, requested rehire, triggering the employer's obligation, in March 1975. Although operations commenced the week of May 17, 1975, Solboro did not make an offer to Moravec until June. Thus, she was unlawfully barred from working between May 17 and the date of her offer in June, and should be awarded backpay for that period of time. Additionally, she was denied rehire, for impermissible reasons, as found by the ALJ, after she wrote to the company on July 14, 1975. Thus, she is entitled to backpay for the period beginning with that date.

Order *enforced* as so modified.

---

3. Pursuant to *F. W. Woolworth Co.*, 90 N.L.R.B. 289 (1950), and *Isis Plumbing & Heating Co.*, 138 N.L.R.B. 716 (1962).