Robert S. FUCHS, Regional Director of the First Region of the National Labor Relations Board, for and on Behalf of the NATIONAL LABOR RELATIONS BOARD

v.

JET SPRAY CORPORATION and Jet Spray Employees' Committee, a/k/a Jet Spray Employees' Association.

Civ. A. No. 83–0091–Z.

United States District Court,
D. Massachusetts.

March 23, 1983.

Carol Sax, N.L.R.B., Region 1, Boston, Mass., for petitioner.

Mark Peters, Mahoney, Hawkes & Goldings, Boston, Mass., for defendant, Jet Spray Corp.

Joseph Sandulli, Boston, Mass., for defendant Jet Spray Employees' Committee, a/k/a Jet Spray Employees' Ass'n.

### MEMORANDUM AND ORDER

ZOBEL, District Judge.

The Regional Director of the National Labor Relations Board brings this petition on the Board's behalf under Section 10(j) of the National Labor Relations Act (the "Act"), 29 U.S.C. § 160(j), against Jet Spray Corporation and the Jet Spray Employees' Association, a labor organization. Petitioner claims that the company committed a number of unfair labor practices during an organizational drive by the United Automobile, Aerospace & Agricultural Implement Workers of America (the "UAW") at the company's plant last summer. Those violations allegedly culminated in the unlawful recognition and bargaining with the Association, with which the corporation now has a collective bargaining agreement. The § 10(j) petition seeks an injunction and other relief, including reinstatement of discharged employees and a bargaining order, pending a final determination of the case by the Board. The parties have waived an evidentiary hearing and have instead submitted affidavits by various employees, supervisors and the corporate president.

## A. "Reasonable Cause"

■ I note initially that the court's inquiry is a limited one in a § 10(j) proceeding. *Fuchs v. Hood Industries*, 590 F.2d 395, 397 (1st Cir.1979). I am not to decide the merits of the case but need only determine whether the Regional Director has reasonable cause to believe that unfair labor practices have been committed. With respect to issues of fact, the Director's view should be given the benefit of the doubt. *Seeler v. Trading Port Inc.*, 517 F.2d 33, 37 (2d Cir.1975). Where more than one inference is possible, the inference should be drawn in favor of petitioner. *Hirsch v. Trim Lean Meat Products*, 479 F.Supp. 1351, 1355 (D.Del.1979). Due deference should also be accorded the Board's legal theories. On questions of law, petitioner's view should be sustained unless the court is convinced it is wrong. *Kaynard v. Palby Lingerie, Inc.*, 625 F.2d 1047, 1051 (2d Cir. 1980). I am not to decide if the Board after a full hearing would *in fact* find that the Act has been violated. I need only conclude that the Board *could* come to that conclusion. *Fuchs v. Hood Industries*, 590 F.2d 395, 397; *see also National Maritime Union of America v. Commerce Tankers Corp.*, 457 F.2d 1127, 1133 (2d Cir.1972).

### 1. Findings of Fact

With the above principles in mind, I find the facts to be as follows. The Jet Spray Corporation is a beverage equipment manufacturing company engaged in interstate commerce within the meaning of the Act. As of June 30, 1982, 209 employees worked in the production and maintenance departments.[1] In the winter of 1980 to 1981, the company relocated from a facility in Waltham to one in Norwood. The move disrupted business organization and resulted in a certain amount of dissatisfaction among the workforce. On April 12, two of the employees, Leonard Murgo and Michael Regan, contacted the UAW. The union held its first organizational meeting April 20 at a Dedham hotel.

About this same time, Jet Spray President Leonard Jacobs became aware of the union activity and called in his attorney Charles Mahoney for "advice." On April 23, Jacobs sent a letter to each employee announcing his plans to meet with them in order to discover what problems they had. The employees were told to elect two people from each department who would represent them on a committee and present their grievances. After one aborted meeting, twenty committee members met with Jacobs and his attorneys, including Mahoney, on April 28. Jacobs' secretary took notes. The meeting, and all later ones, took place on company property and company time.

Jacobs was presented with a list of employee problems and promised to deal with them. At the same time, he referred to the importance of remaining a "happy Jet Spray family" without the intrusion of "outsiders." According to three employees present, Mahoney was even more explicit: he said that the company would not put up with "guerrilla activity" and "jungle warfare," warned employees against involvement with the union, and threatened "long legal battles."[2] He asked the committee to

---

1. The Board submitted the affidavit of maintenance mechanic Michael Regan who "estimates" that there were 170 employees in the production and maintenance departments. That affidavit was executed on February 2, when there may very well have been that many employees in those departments. However, the affidavit does not clearly state that the same number were employed June 30, the day the petition claims that the UAW had a card majority. Indeed, the evidence is to the contrary. Payroll clerk Sharon Costa says in her affidavit that payroll records show 209 employees as of that date. Personnel supervisor Elaine Clements uses the same records to come up with the figure of 213. Without deciding questions of credibility, I find that Costa and Clements are more competent to give accurate information about the number of people in those departments than a mechanic making his own investigation several months after the relevant date. I use the number of 209 because it is the lower of the two figures, thus giving the Board the benefit of the doubt to that extent.

2. Mahoney unequivocally denies these statements (as well as many others attributed to him by the Board) and says that he instead told employees that they had a *right* to organize. In a § 10(j) proceeding, however, the court cannot and should not decide questions of credibility.

give the company time to solve their problems before going to "outsiders" for help. The UAW had had its second organizational meeting with Jet Spray employees only two days before.

On April 29, the UAW distributed a flyer outside the plant announcing a May 3 meeting. A second flyer was distributed the morning of the meeting. That night, union authorization cards were handed out to employees for distribution. Three days later, another leaflet was handed out in front of the plant announcing the card solicitation drive. By June 30, the day the Board says that the UAW had a clear majority, 88 employees had signed authorization cards.[3] Union activity in these spring and summer months was clearly visible and could not have escaped the notice of management.

On May 3, Jacobs sent a letter to employees promising to take steps to establish a First Aid Room, to supply a nurse and physician, and to review the processing of merit pay increases. He also promised prompt implementation of a credit union and the development of a sick leave policy. Committee members met again with management on May 5 to discuss employee problems. According to two employees present, Jacobs and Mahoney once more stressed the need to stop those trying to organize for the union and to act together as a "family." The next day, Jet Spray employees were polled by department as to whether they would withhold union support in order to give Jacobs a chance to correct their complaints.[4] Most departments voted by a show of hands; the maintenance department, represented by union activists Murgo and Regan, boycotted the poll. Each department reported to Jacobs the poll's results, which were that employees would give Jacobs time.

On May 17, a formal survey prepared by an outside organization was conducted at the plant. Employees were asked whether they were happy with their wages and how they got along with their supervisors, among other things. The following day, Jacobs and Mahoney met with committee members, Jacobs' secretary again taking notes. Mahoney warned employees against the solicitation of union cards on company property, and threatened to terminate those who did.[5] He also said that the company would deal severely with anyone on the committee involved with the union. By this time, the committee had a spokesman, employee Barry Carr. He acted as liaison between management and the workforce, passing on individual grievances and in turn relaying information back to workers, some of which only served to underline management's hostility to an outside union.[6] Carr had ready access to supervisors and often took credit as committee spokesman for resolving particular grievances.

Over the next two weeks, many benefits that Jacobs had promised were put into effect. In addition to safety-related benefits, the company announced a new sick leave and personal leave policy, changed the procedure for coffee breaks, and announced new merit pay raise and cost of living plans. In the meantime, various employees active in their support of the UAW had started to experience difficulties at work. Supervisors kept an eye on workers' talking, warning them that only job-related discussions were permissible. Several were issued for-

---

I therefore accept the Board's version of events, as told by employees.

3. The parties agreed at the hearing that 88 production and maintenance employees had signed cards as of June 30.

4. A letter from Jacobs to employees described the departmental "meetings" as a way to determine if the committee had the employees' support.

5. Mahoney admits in the affidavit he submitted to the Board that he told employees that card solicitation on company property was not to be done and that he "might have" warned them that anyone who did could be fired.

6. For example, various employees reported that Carr told them that management knew who was attending UAW meetings, implying that illegal surveillance of employees was going on. Carr also talked of a "hit list" of union activists, which included those employees eventually discharged.

mal warnings for their conduct.[7] On May 10, union organizer Murgo was questioned by his supervisor about who contacted the UAW and who was involved in the organizational campaign. On June 3, Murgo, Regan and Paul Natale, also a UAW supporter, were all assigned to report directly to the old plant in Waltham to clean it up. Natale stayed two weeks; Murgo and Regan worked there for well over a month. Conveniently, they were not notified of committee meetings in advance. They were effectively isolated from other employees at a time when the UAW was trying to garner support.

On July 26, Murgo's supervisor Roger Messier informed him and another union supporter Edward Taylor that they were laid off. Both Murgo and Taylor had more seniority than other employees in the maintenance department and had both received pay raises a few months before. They asked about other work in the plant which was apparently available, but a supervisor who promised to check never got back to them about it. The two layoffs occurred during a plantwide vacation for employees, one week before other layoffs at the plant occurred. Taylor was himself on vacation and was called at home with the news of his termination. He had been with the company for two years.

By August, unfair labor practice charges had been filed against Jet Spray. Undaunted, the company prepared to conduct its own election among employees. All in the plant were to vote—clerical workers along with maintenance personnel. They were to choose between the Jet Spray Employees' Committee and the UAW. On August 10, two days before the secret ballot

poll was to take place, the UAW sent a letter by certified mail to the company with a copy to Mahoney (whose office received it August 11). The letter claimed that the UAW had a card majority of production and maintenance employees and demanded recognition or alternatively a Board-sponsored election. The UAW then immediately filed an election petition with the Board. Nevertheless, Jet Spray proceeded to hold its own election, conducted by an outside accounting firm. Of the 203 employees who voted, 124 voted for the committee compared to 56 for the UAW. (Twenty-two voted for no organization.)

Fully aware of the UAW's claim of a majority, the pending election petition, and the still unresolved charges against it, Jet Spray recognized the employees' committee as the exclusive bargaining agent. The company and the committee, renamed the Jet Spray Employees' Association, began to negotiate a contract in October. In January, the two signed a collective bargaining agreement with a union security clause.

In the fall of 1982, two other employees active in the UAW campaign were terminated. In September, William Mullins was fired for failing to call his supervisor during a prolonged absence from work. Mullins had received a back injury on the job August 16. He said that he called the payroll clerk about his absence once a week for the three weeks he was gone, but he admits that he never told his supervisor.[8] Company rules require the employee to notify his immediate supervisor or risk dismissal. Randall Vautour, a quality control inspector, was fired November 18 following four warnings.[9] Two warnings arose from the

---

7. In May, product pack inspector William Mullins was issued a warning for leaving his job station. It was eventually torn up. On June 28, union supporters Paul Natale and John Zawadski were given written warnings for standing around and talking. That same day, employee Paul Tague, who had cut his head near the loading dock, was issued a warning for being in the wrong work area.

8. Mullins says that his doctor told him he sent three letters to the company about Mullins' injury in the three weeks he was absent. This

information is hearsay; I have been provided with no letters, and company personnel deny hearing from Mullins at the time.

9. Vautour's support for the union was well known. He called an emergency meeting of the employees' committee to express his opposition to the inclusion in a committee memo of an attack on the UAW. He refused to pay dues to the committee after the company had recognized it, stating in reply to a supervisor's questions that he did not think that the organization was legal.

same incident: Vautour returned two days late from a vacation without notifying the company. The third warning was for leaving crumpled newspaper at his work station overnight, and the fourth was for talking. The warnings occurred within a one month period. Vautour's record with the company in his five years of working had been clean up until then.

## 2. Conclusions of Law

The Board contends that the company has violated Sections 8(a)(1), 8(a)(2), and 8(a)(3) of the Act, 29 U.S.C. § 158. Section 8(a)(1) forbids an employer from interfering with, restraining or coercing employees in the exercise of their right to organize. Section 8(a)(2) prevents a company from dominating, interfering with or unlawfully supporting a labor organization. Section 8(a)(3) makes it unlawful to discriminate against employees in regard to the terms and conditions of their employment with the purpose of discouraging union activity. Although I do not agree with the Board in every particular and without passing on every instance of misconduct that it alleges,[10] I conclude that the Regional Director has reasonable cause to believe that the company violated all three provisions.

 There are a number of grounds upon which the Board could base a decision that § 8(a)(1) was violated. First, Jet Spray promised and implemented a variety of benefits beginning in late April and continuing into the summer. There is sufficient evidence to conclude that it knew of the UAW's organizational efforts from their inception and made the decision to make changes in working conditions in order to deter employee support for the union. The conferral of benefits during an organizational campaign with the purpose of inducing employees to vote against the

union is an unfair labor practice. N.L.R.B. v. Exchange Parts Co., 375 U.S. 405, 84 S.Ct. 457, 11 L.Ed.2d 435 (1964); N.L.R.B. v. Styletek, 520 F.2d 275 (1st Cir.1975). Second, Jet Spray solicited grievances of employees—by letters from Jacobs, by the formal survey conducted on May 19, and during committee meetings with management. These solicitations, made in conjunction with promises to correct the grievances, and in the context of threats and interrogation of employees, could also be reasonably found to violate the Act. See General Electric Company, 255 N.L.R.B. 673 (1981); St. Joseph's Hospital, 247 N.L.R.B. 869 (1980). Third, the polling of employees at the plant, informally in May and formally in August in the employer-sponsored election, appears to constitute an unfair labor practice. Both polls were taken to determine the extent of employee support for the union and occurred in the context of other employer misconduct. The first poll, where employees voted by department, was not by secret ballot and provided an easy method by which supervisors could identify those sympathetic to the UAW. The second followed notice to the company of the UAW's demand for recognition or a Board-sponsored election and could not have served any purpose other than the circumvention of Board machinery. As such, the polls were not conducted in accordance with the safeguards laid out in Struksnes Construction Co., 165 N.L.R.B. 1062 (1967). Finally, the Regional Director has reasonable cause to believe that Jet Spray engaged in coercive conduct by the express threats of "long legal battles" and thinly disguised reprisals against union sympathizers. Jet Spray attorney Mahoney's statements, as related by employees at the committee meetings, would themselves amount to unfair labor practices if actually made. The transfer and conse-

---

**10.** For example, I do not pass on the allegations of illegal surveillance or company "hit lists" since the statements supporting those charges came from employee Barry Carr. It is unclear whether he was an agent of the company or whether the statements are hearsay, and thus inadmissible. Nor do I decide whether the interrogation of individual employees amounted to an unfair labor practice. There are only two instances of one-on-one questioning by supervisors. Although they contribute to a general atmosphere of coercion and support my findings that other unfair labor practices were committed, they may not themselves amount to illegal acts when viewed in isolation.

quent isolation of employees Murgo and Regan to the old plant and the warnings to other union supporters were clear signals to employees that they were in for a tough time if they backed the UAW.

 I find that there is ample basis for concluding that § 8(a)(2) was violated by virtue of the support Jet Spray rendered the committee from its creation onward. The committee began at the direction of Jacobs, his secretary took notes at meetings, and committee spokesman Barry Carr appeared to have the run of the plant and ready access to supervisors. Meetings took place on company property and company time. Although courts have been more lenient than the Board in tolerating employer assistance, *see, e.g. Hertzka & Knowles v. N.L.R.B.,* 503 F.2d 625 (9th Cir.1974), *cert. denied,* 423 U.S. 875, 96 S.Ct. 144, 46 L.Ed.2d 106 (1975), Jet Spray's favors to the committee were accompanied by the denial of similar benefits to the UAW and occurred in a general atmosphere of coercion and anti-union bias. Mahoney strictly admonished employees against soliciting cards for the UAW on company property and, along with Jacobs and various supervisors, made it clear that "outsiders" were not welcome. When bestowed in the context of discrimination against and hostility toward a rival union, employer support of a labor organization is no longer friendly cooperation but the kind of conduct that the Act was intended to prevent. *See* Gorman, *Labor Law* §§ 5–6 at 201–202 (1977).

 There is also reasonable cause to believe that Jet Spray violated § 8(a)(2) (and § 8(a)(1)) by its recognition of the committee (by then, the Association) after the UAW had presented its demand for recognition and filed an election petition with the Board. The Board demands strict neutrality of an employer faced with two rival unions; recognition of one union over the other is appropriate only if there is no real question of representation. *Midwest Piping*

*and Supply Co.,* 63 N.L.R.B. 1060, 1070 (1945). Courts have interpreted that requirement to mean that the union which is recognized must have the support of the clear majority of employees *and* that the support is uncoerced. *Oil Transport Co. v. N.L.R.B.,* 440 F.2d 664 (5th Cir.1971); *N.L.R.B. v. Air Master Corp.,* 339 F.2d 553 (3d Cir.1964). Even if the employer-sponsored election established the Association's majority status among production and maintenance employees,[11] it cannot be concluded that such a majority was uncoerced. The reason the Board did not proceed with the UAW's request for an election was the danger that unfair labor practices already committed by the company had created an environment in which employee free choice would be impossible. To permit the employer to hold its own election in such a situation and recognize the winner with impunity would undermine the protections that the Board machinery affords and allow the company to profit from its illegal acts.

 Finally, I find that there is a reasonable basis to conclude that certain disciplinary actions taken by the company against employees sympathetic to the UAW amount to a violation of § 8(a)(3). An employer violates that provision if he takes steps against an employee, intending to discourage union membership and support. The Board must show that the worker would not have been discharged or disciplined *but for* his union activity. *N.L.R.B. v. Wright Line,* 662 F.2d 899 (1st Cir.1981), *cert. denied,* 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982). Without deciding whether the Board, after a full hearing and after consideration of *all* the evidence, would find discrimination in this case, I conclude that the Regional Director has presented sufficient evidence at this preliminary stage to show that Murgo, Taylor, and Vautour were discharged, and other employees warned, because of their union involvement. The timing of the layoffs of

---

11. The Board says that the production and maintenance departments together would constitute an appropriate bargaining unit. Because employees outside those departments voted, and because the election was conducted by secret ballot, it is impossible to determine exactly how many of those within the appropriate unit would support the Association.

Murgo and Taylor, coming as they did before all other layoffs, is of particular importance. *See N.L.R.B. v. Solboro Knitting Mills, Inc.,* 572 F.2d 936, 942 (2d Cir.), *cert. denied,* 439 U.S. 864, 99 S.Ct. 188, 58 L.Ed.2d 174 (1978). (Timing of layoffs provided "strong evidence" of discrimination.) Also relevant is their comparative seniority in the plant and the treatment Murgo had already received from the company, which appeared intent on isolating him. The circumstances of Vautour's termination are especially suspicious. After five years of an unblemished record with Jet Spray, he gets four warnings in one month, some of them for trivial offenses. Finally, looking at the evidence in the light most favorable to petitioner, I find that the Board could conclude that the warnings to employees Zawadski, Natale and Tague violated § 8(a)(3).

■ I cannot reach the same conclusion with respect to Mullins, however. He himself admits that he violated a company rule in failing to notify his supervisor during an extended absence from work. The rule warns that those who fail to comply may be dismissed. The Board presents no evidence that the rule had fallen into disuse and was invoked only to supply a pretext for his firing. Nor is there any evidence that it was applied discriminatorily. Perhaps a full hearing would reveal these facts. But at this early stage and faced with a request to reinstate wrongfully discharged employees, the evidence is insufficient to support the Regional Director's claim that Mullins was unjustly fired.

### B. *"Just and Proper" Relief*

■ Having found reasonable cause to believe that unfair labor practices have been committed, I must now decide whether the relief that the Board requests is "just and proper," as required by § 10(j). The reasonable cause finding does not alone mean that the requested relief should be granted. Do the circumstances of this case raise a reasonable apprehension that the purposes of the Act will be frustrated if relief is denied? *Angle v. Sacks,* 382 F.2d 655, 660 (10th Cir.1967). The Second Circuit has noted that § 10(j) does not change the general principle that injunctive relief is an extraordinary remedy. *McLeod v. General Electric Co.,* 366 F.2d 847, 849 (1966), *set aside on other grounds,* 385 U.S. 533, 87 S.Ct. 637, 17 L.Ed.2d 588 (1967). It should only issue where special circumstances exist showing a danger of irreparable harm or the necessity of preserving the status quo. The status quo to be preserved (or restored), however, is the one which existed prior to the commission of the unfair labor practices. *Seeler v. Trading Port, Inc.,* 517 F.2d at 38. The employer should not be able to profit from Board delays in hearing the case by reaping the benefits of a situation which it unlawfully created in the first place.

■ A cease and desist order is clearly appropriate. The unfair labor practices allegedly committed here were pervasive and ongoing. Jet Spray has shown its willingness in the past to persist in its conduct despite Board objection and the filing of charges: it recognized the Association in the face of an election petition, and only two months ago signed a collective bargaining agreement which is most likely unlawful. It may very well continue to violate the Act if not restrained.

■ Similarly, the relief requested to remedy the § 8(a)(3) violations is entirely appropriate. Discharged employees Murgo, Taylor and Vautour were all active in supporting the union, and failure to reinstate them could have a serious adverse impact on employee interest in unionization. *Kaynard v. Palby Lingerie, Inc.,* 625 F.2d at 1053 (holding that reinstatement was a proper remedy on the same grounds). Reinstatement of those three employees before a Board hearing will help recreate conditions as they existed almost a year ago. Moreover, Jet Spray shall not use the warnings issued against Zawadski, Natale and Tague on June 28 last year, pending Board determination as to their lawfulness. Nor shall the warnings issued to Vautour preceding his dismissal provide a basis for disciplining him upon his reinstatement until the Board finally decides.

The Board also seeks an order requiring Jet Spray to withdraw its recognition of the Association and setting aside the collective bargaining agreement it signed in January. Not surprisingly, the Association strongly opposes this request, on the grounds that the employees have certain rights and benefits under the contract which they would no longer enjoy if it were set aside. First, withdrawal of those rights and benefits is not required by this order. Second, given the strained employee relations experienced over the past year, it would appear to be bad business judgment indeed to withdraw them. Third, setting aside the contract is virtually required. If the company were permitted to continue to recognize the Association and the recognition is in fact unlawful (as it appears to be), the Court would in effect condone an ongoing violation of the Act. Moreover, the recognition confers upon the Association a certain favored status, and the contract it negotiated serves to solidify its position as employee representative. An order withdrawing recognition and setting aside a contract is appropriate to prevent irreparable harm to the rival union by the defection of its supporters and to prevent the recognized union's entrenchment. *Brown v. Pacific Telephone and Telegraph Co.,* 218 F.2d 542, 544 (9th Cir.1955); *Kaynard v. Mego Corp.,* 484 F.Supp. 167, 185 (E.D.N.Y.), aff'd as modified, 633 F.2d 1026 (2d Cir.1980).[12] There is clear evidence that the UAW has already suffered such harm and that any more delay may make a fair election in the future impossible.[13]

Finally, the Board requests that Jet Spray be ordered to bargain with the UAW because of the number and severity of the unfair labor practices it has committed. *See N.L.R.B. v. Gissel Packing Co.,* 395 U.S. 575, 89 S.Ct. 1918, 25 L.Ed.2d 547 (1969). A bargaining order may be appropriate in a § 10(j) proceeding if (1) a clear majority of employees supported the aggrieved union at some earlier time, and (2) the employer then engaged in such misconduct that a fair election would be impossible. *Kaynard v. Palby Lingerie, Inc.,* 625 F.2d at 1054. Although the second condition may well have been met here, the Regional Director has failed to show that the UAW had a clear majority as of June 30, the date specified in the petition. As of that date, 88 employees had signed cards out of the 209 in the production and maintenance unit. *See supra* note 1.

Both Jet Spray and the Association argue more generally that no relief should be granted because of the Board's delay in processing this case. The bulk of the unfair labor practices at issue here occurred last summer and most charges were filed by September. Yet the Regional Director did not bring this action until late January and administrative action does not appear imminent. I do not find it proper to deny relief simply because of the Board's delay, however, since that attitude would effectively penalize employees for reasons entirely beyond their control. *Solien v. Merchants Home Delivery Service,* 557 F.2d 622, 627 (8th Cir.1977). I am nevertheless troubled by the prospect that the administrative machinery will move even more slowly now that the Regional Director has gained much of the relief sought. Because part of that relief requires withdrawal of recognition and setting aside a contract, I am also concerned that the employees will be left unrepresented and without the protection of a

---

**12.** Although the appellate court in the *Kaynard v. Mego Corp.* case said that the district court ruling "stretches § 10(j) to its limits," its criticism centered on the particular facts of that case. There, the unfair labor practice charged was hardly egregious, and the lower court's finding of irreparable harm to the rival union was considerably undercut by the fact that employees remained loyal to the union despite the employer's recognition of another group. In contrast, the unfair labor practices here are serious and the UAW has clearly lost support by virtue of the unlawful recognition of the Association.

**13.** Although it is unfortunate that the parties' efforts in negotiating a contract will go for naught, they were on notice well before they began that an attack on any agreement would be mounted. If the company had not so hastily rushed into recognizing the Association and awaited a Board election, this problem would not have arisen.

contract for some time. Although § 10(j) provides a vehicle for interim relief, it also carries the disadvantage of having a court decide questions which Congress determined are best resolved by an agency with some expertise. It is therefore appropriate that time limitations be placed on the order in this case to ensure that temporary relief does not become equivalent to final disposition of the controversy. *See, e.g., Kaynard v. Mego Corp.,* 633 F.2d at 1035; *Eisenberg v. Hartz Mountain Corp.,* 519 F.2d 138, 144 (3d Cir.1975).

For the reasons stated, it is Ordered, that Jet Spray Corporation:

(1) cease and desist from committing any unfair labor practice, including any of the specified acts of misconduct discussed in this opinion;

(2) withdraw and withhold recognition of the Jet Spray Employees' Association;

(3) reinstate employees Leonard Murgo, Edward Taylor and Randall Vautour;

(4) desist from using written warnings issued to John Zawadski, Paul Tague and Paul Natale on June 28, or to Vautour in October and November 1982, as a basis for future disciplinary action pending final determination by the Board;

(5) post this court's order on all employer bulletin boards or in equivalent places.

It is further Ordered that the collective bargaining agreement presently in existence between the company and the Association be and it hereby is set aside.

It is further Ordered that this Order shall remain in effect for a period of four months to enable the Administrative Law Judge to issue his findings. If his findings warrant a continuation of relief, the order may be extended for six months, upon appropriate request, to give the Board time within which to reach a final decision.